**FIRST DIVISION
BROWN, C. J.,
BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 1, 2025**

# In the Court of Appeals of Georgia

A25A1134. MOTON v. EMORY HEALTHCARE, INC. et al.

BROWN, Chief Judge.

In this medical malpractice case, Georgia Moton sued registered nurses Melanie Kinder, Rose White, and Betty Stokes, along with their employer Emory Healthcare, Inc. ("Emory") (collectively "defendants"), alleging that defendants inappropriately administered Dilantin through an intravenous ("IV") line in Moton's left hand instead of through a larger IV line in her neck, resulting in tissue damage and the eventual amputation of her left hand. The trial court granted summary judgment to defendants on the ground that the "only" evidence in the record shows that defendants administered Dilantin through the IV in Moton's neck. Moton appeals, contending that the trial court erred in granting summary judgment to defendants

because there is "competent circumstantial evidence" that Moton's injury could have resulted from the administration of Dilantin through the IV in her left hand. For the reasons discussed below, we reverse.

> Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. OCGA § 9-11-56 (c). We review the grant of summary judgment de novo, construing the evidence and all reasonable inferences in favor of the non-moving party.

(Punctuation omitted.) *Edokpolor v. Grady Mem. Hosp. Corp.*, 347 Ga. App. 285, 286 (1) (819 SE2d 92) (2018). So viewed, the record shows that on October 29, 2019, Moton was admitted to Emory Hillandale Hospital for an altered mental state following an accidental overdose of prescribed Keppra. While at Emory Hillandale, medical personnel established four IV lines for the administration of medication, including three 20-gauge lines (left wrist, left antecubital area, and left side of neck) and one 22-gauge line (left hand). On October 31, defendant White intravenously administered to Moton an initial loading dose of Dilantin, and on November 1, defendant Stokes intravenously administered a second dose of Dilantin. At the time

Moton was administered both doses of Dilantin, she was sedated, on a ventilator, and unable to communicate. Medical staff did not document through which IV the medication was administered, but, on November 2, 2023 — four years after Moton's hospitalization — Stokes deposed as follows:

Q: Okay. Do you remember independently what IV site you used to administer the Dilantin?

A: Yes, I do.

Q: What IV site did you use?

A: I used the left jugular to give Dilantin.

Q: Where did you administer the Dilantin? In other words, which IV site did you administer the Dilantin that Ms. Moton received?

A: Through the left jugular.

Q: Is there any doubt in your mind about that?

A: No doubt.

Q: And it's my understanding that you used the same site that Nur[s]e White[1] used to administer the [Dilantin]?

A: Yes.

(Punctuation omitted.) Several hours after the second dose of Dilantin, Moton was transferred to Emory University Hospital ("EUH"). Upon her arrival to EUH, medical staff noted that Moton's left hand was mottled and swollen.

Two days later, on November 3, 2019, hospital staff, including plastic surgery resident Chris Stewart, noted on Moton's left hand the presence of "a large bullae on the ulnar aspect . . . involving the small and ring finger" and "multiple scattered small bullae to the dorsal and palmar aspect."[2] At the time, Dr. Stewart also noted as follows: "Assessment and Plan: 74-year-old female with ESRD on hemodialysis, right upper extremity AV fistula presenting with encephalopathy and pressor-induced

---

[1] The record does not reflect whether or not nurse White was deposed; the only evidence of nurse White's statements about the case appear in the deposition of Emory's 30 (b) (6) representative, who explained, as discussed infra, that nurse White did not have an independent recollection of her treatment of Moton or what she did on the dates of treatment.

[2] Bullae are large blisters. See www.merriam-webster.com/dictionary/bullae. According to Stewart, his notes meant that Moton had multiple areas of evolving necrosis.

necrosis of left hand. Patient's symptoms are consistent with pressure-induced necrosis of left hand, plus or minus IV infiltration injury, unclear."[3] When Moton was discharged on November 19, 2019, the "Discharge Documentation" prepared by hospitalist physician Nivedea Basu, noted the following: "Appears she had IV infiltration [with] resulting left and/left digits tissue necrosis"; "IV Infiltration/L Hand Tissue Necrosis [and] L Hand Cellulitis . . . appears to be attributed to IV infiltration of AED (IV Dilantin)"; and that Moton "will need outpatient F/U for elective amputation[.]" Dr. Basu did not diagnose Moton and explained in her deposition that the discharge summary is "typically a compilation of notes, test results of a patient that I compile from their hospitalization and put in a brief summary for their outpatient healthcare providers to see." She explained her process for compiling a discharge summary as follows:

> So I would pull up a template from my electronic medical record. And then I would be inputting in information that I get from other notes. For instance, I will copy the History of Present Illness that is in the History

---

[3] Pressor-induced necrosis refers to necrosis (death of living tissue) induced by vasopressors, i.e., medications that increase blood pressure. Vasopressors are typically administered through an IV and can result in a pressor-extravasation injury where medication, which should be going directly into the venous system is released into the tissue surrounding the delivery site.

and Physical or Admission Notes. I would input in — look for, you know, images or test results and put those in . . . . And then I will sometimes include if a subspecialist or other consultant put in their recommendations. I might also include that in the discharge summary and any follow-up instructions.

When asked about certain "sections" listed on Moton's discharge summary such as "seizures, acute toxic encephalopathy, IV infiltration/left hand tissue necrosis," and whether they were included as definitive diagnoses, Basu responded "No," and that she did not know "if the doctor whose note I took this from arrived at a definitive diagnosis." (Punctuation omitted.) Finally, Dr. Basu confirmed that she wrote "[a]ppears to be attributed to IV infiltration of AED" because "there could be other potential causes of that injury."

Approximately eight weeks after Moton was discharged from the hospital, she had her left hand amputated. Moton filed this medical malpractice action against defendants alleging that they breached the standard of care resulting in injury to her left hand by administering Dilantin through the small vein in her hand instead of a larger vein. In support of her claims and the issue of causation, Moton relied on Dr. Basu's discharge summary/"Discharge Documentation," the deposition testimony

of Emory's 30 (b) (6) representative, as well as the expert testimony of Dr. Susan Smith, who has a doctorate in nursing, and plastic and reconstructive surgeon Daniel Liu.

Dr. Smith testified that the standard of care for administering Dilantin is through a large vein rather than a smaller vein such as the hand, and that if Dilantin is administered through a small vein, "it's very likely that there will be an extravasation with tissue death in the area." Dr. Smith opined that based on the outcome here, "[i]t's more likely than not that [defendants] used the hand veins."

Using differential diagnosis methodology[4] to reach his opinion, Dr. Liu testified that it is "more likely than not, [the] Dilantin was infiltrated through the peripheral IV that was inserted in the left hand of Ms. Moton, resulting in the injuries that she sustained." Dr. Liu explained that the "chemical structure [of Dilantin has] characteristics specifically related to a PH that lead to a more severe tissue injury if it infiltrates." When asked about other potential causes such as vasopressor-induced

---

[4] Differential diagnosis is a physician's method of considering all possibilities for a diagnosis, taking into account information gathered from a patient's history, objective findings, and using experience and probabilities to rule out specific diagnoses, therefore arriving at a ranked order of possibilities for diagnosis. See, e.g., *Sampson v. Med. Center*, 369 Ga. App. 627, 632 (894 SE2d 198) (2023) (noting that differential diagnosis methodology is sufficient under Georgia law).

injury, thrombosis, infections, and pressure-related injuries, Dr. Liu testified that he "categorically rule[d] out" vasopressor-induced injury because Moton had not received any vasopressors; as for the other potential causes, he "ruled them out as being far less likely." While he could not definitively rule them out, he testified "that they were less likely than extravasation."

Moton also filed the deposition of Emory's 30 (b) (6) representative taken on December 9, 2021,[5] who testified that the standard of care does not "in every instance" require medical staff to document what medications were administered through which IV site. The representative confirmed that the medical staff did not document through which IV the Dilantin was administered to Moton but testified that "based on their normal practice" both Stokes and White would know to administer Dilantin in a large vein (such as the jugular/neck) or through a central site. When asked if either Stokes or White had an independent recollection of "their time or their treatment of" Moton or what "they did on" the dates of treatment, the representative testified that they "don't have an independent recollection."

---

[5] The representative's deposition was taken approximately two years after Moton's injury and two years before nurse Stokes' deposition.

Defendants moved for summary judgment on proximate cause, arguing that the only direct evidence in the record reflects that defendants administered both doses of Dilantin through the IV in Moton's neck and that Moton and her experts are impermissibly relying on res ipsa loquitor. The trial court granted the motion, concluding that Moton had failed to carry her burden of establishing proximate cause through expert testimony. In so ruling, the trial court found that res ipsa loquitor does not apply in a malpractice suit and that Moton's experts' failure to point to any evidence showing the Dilantin was administered through the IV in Moton's left hand and their concession that they were inferring negligence merely because of the injury required the "exclusion" of their testimony. The trial court also ruled that Moton's inability to establish that the Dilantin was administered through an IV in Moton's left hand rendered the experts' opinions unreliable and inadmissible, and that the discharge summary was inadmissible as an admission by a party opponent under OCGA § 24-8-801 (d) (2) because Dr. Basu was not an employee of Emory Healthcare, Inc., but, that even if she was, the discharge summary does not meet the requirements to establish proximate cause because use of the word "appears" is not an opinion stated to a reasonable degree of medical certainty. This appeal followed.

9

1. In its order granting summary judgment to defendants, the trial court concluded that "all of the evidence in the record is that the Dilantin was administered through an IV in [Moton's] neck." Moton contends that this conclusion is erroneous and we agree.

As this Court has consistently stated in summary judgment cases, the party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact in order to be entitled to judgment as a matter of law. See, e.g., *Ray v. Hadaway*, 344 Ga. App. 642 (811 SE2d 80) (2018). To satisfy this burden, "the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." *Raven v. Dodd's Auto Sales & Svc.*, 117 Ga. App. 416, 420 (1) (160 SE2d 633) (1968). However, "[w]here a question of credibility arises as to a material issue, summary judgment should not be granted." *Ash v. Spear*, 137 Ga. App. 12, 13 (223 SE2d 26) (1975). See also *Raven*, 117 Ga. App. at 421 (3) (where a contradiction by other witnesses concerns a matter relevant and material to the issue, it is error to grant a motion for summary judgment). "To satisfy the moving party's burden the evidentiary material before the court, if taken as true, must establish the absence of any genuine issue of material fact,

and it must appear that there is no real question as to the credibility of the evidentiary material, so that it is to be taken as true." *Raven*, 117 Ga. App. at 422 (3).

As Moton points out in her brief, evidence that nurses administered Dilantin through the IV in Moton's neck (and not her hand) comes only from Stokes' testimony some four years after she treated Moton in the ICU. Even setting aside Moton's assertion regarding the questionable reliability of Stokes' memory of treating an ICU patient some four years prior, Emory's 30 (b) (6) representative contradicted Stokes' testimony, testifying that during Emory's investigation of the incident (which necessarily occurred sometime before the representative's deposition on December 9, 2021 ), neither nurse could independently recollect their treatment of Moton or through which IV they administered the Dilantin.[6] The vein through which defendant nurses administered the Dilantin is the material issue in this case and its resolution depends upon the finder of fact considering the credibility of the witnesses. See, e.g., *Miller v. Douglas*, 235 Ga. 222, 223 (219 SE2d 144) (1975) ("[i]n motions for summary judgment, this court cannot consider the credibility of witnesses . . . and a jury must resolve the question and the conflicts in the evidence which it produces"). The

---

[6] It follows that there is no merit in defendants' claim that Moton has offered no "actual evidence that would impeach [nurse Stokes'] testimony."

witness contradiction in this case is precisely the type of conflict in the evidence that creates a genuine issue of material fact precluding summary judgment. Cf. *Cherokee County Hosp. Auth. v. Beaver*, 179 Ga. App. 200, 202-204 (2) (345 SE2d 904) (1986) (affirming denial of hospital's motion for summary judgment where conflict existed between hospital's expert witnesses' testimony as to injection site and plaintiff's testimony: "the location of the external site of the injection is merely a question of fact in this malpractice case, not a medical question such as requires expert medical testimony") (punctuation omitted). For this reason alone, we must reverse the trial court's grant of summary judgment to defendants.

2. In order to provide clarity upon the return of this case to the trial court, we next address the trial court's exclusion of the expert opinions of Drs. Smith and Liu and the discharge summary in its summary judgment analysis.[7] "Admissibility of evidence on motion for summary judgment is governed by the rules relating to form and admissibility of evidence generally." (Citation and punctuation omitted.) *Koules v. SP5 Atlantic Retail Ventures*, 330 Ga. App. 282, 285-286 (2) (767 SE2d 40) (2014).

---

[7] We find no merit in defendants' contention that Moton did not enumerate as error the trial court's ruling that the discharge summary was inadmissible. See, e.g., *Mommies Properties v. Semanson*, 366 Ga. App. 153, 165 (5) (880 SE2d 376) (2022), quoting *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999).

Moreover, while a trial court enjoys discretion as to its decisions regarding the admission or exclusion of evidence, this Court will reverse if the trial court commits a clear error of judgment or applies the wrong legal standard. See id. Such is the case here.

(a) *Experts' Opinions*. The entirety of the trial court's order, including its exclusion of Moton's expert opinions, was predicated on its conclusion that Moton failed to produce any evidence that the Dilantin was administered via an IV in her hand. Because a genuine issue of fact exists on this issue, however, exclusion of the expert opinions of Drs. Smith and Liu on this basis cannot stand. Additionally, to the extent the trial court excluded the opinions on other grounds, we point out that defendants never moved to exclude the expert opinions. See *Las Colinas Apts. v. Fannie Mae*, 365 Ga. App. 584, 589 (3) (b) (879 SE2d 686) (2022) (objection to affidavit deemed waived where party failed to take exception at the "earliest possible opportunity" and noting that "[a] non-contemporaneous motion to strike is not a procedural tool to object to evidence"). See also *Padillas v. Stork-Gamco, Inc.*, 186 F3d 412, 417 (II) (3rd Cir. 1999) (district court abused its discretion in excluding expert opinion without a hearing focused on the reliability of the testimony). Moreover, "the

appropriate standard for assessing the admissibility of an expert's opinion is not whether it is speculative or conjectural to some degree, but whether it is wholly so." (Punctuation omitted.) *Wadley v. Mother Murphy's Laboratories*, 357 Ga. App. 259, 265 (1) (850 SE2d 490) (2020), quoting *Layfield v. Dept. of Transp.*, 280 Ga. 848, 850 (1) (632 SE2d 135) (2006).

(b) *Discharge Summary*. Moton submitted Dr. Basu's discharge summary in her response to defendants' motion for summary judgment and argued at the summary judgment hearing that it was admissible as an exception to the hearsay rule (admission by a party opponent under OCGA § 24-8-801 (d) (2) (D)).[8] In a supplemental brief filed after the hearing, defendants argued that the discharge summary did not meet this exception as Dr. Basu was not an agent or employee of Emory Healthcare, Inc., and because Dr. Basu's own deposition testimony established that the statement in the discharge summary could not reasonably be interpreted as her opining that Moton's

---

[8] We note that during the summary judgment hearing, defendants argued that the discharge summary was circumstantial evidence of an IV infiltration injury in Moton's left hand that did not defeat the direct evidence from Stokes that she administered the Dilantin in Moton's neck IV. Moton then argued that the medical records "speak for themselves. They say what they mean . . . because they're their own records" and that "it's also conclusive . . . because it's an admission against interest."

injury was caused by infiltration to a reasonable degree of medical certainty. The trial court agreed with defendants and excluded the discharge summary and Dr. Basu's testimony pursuant to OCGA § 24-8-801 (d) (2), and on the ground that it did not "meet the requirements necessary to establish proximate cause."[9]

Moton argues on appeal that she does not need to rely on OCGA § 24-8-801 (d) (2) (D) to establish the admissibility of the discharge summary because it is admissible under OCGA § 24-8-803 (6) as a business record. While Moton is correct that medical records such as a discharge summary are routinely admitted as evidence under the business records exception to the hearsay rule as long as they were kept in the course

---

[9] Moton does not, and has never, relied on Dr. Basu as an expert. Nonetheless, the trial court appears to have excluded her testimony and the discharge summary on the ground that "a reasonable reading" of it would not satisfy Moton's "burden to present an expert opinion regarding proximate causation in terms stronger than that of a medical possibility." Pretermitting whether this ruling is correct, it does not foreclose Moton from offering Dr. Basu as a fact witness. Cf. *Miller v. Golden Peanut Co.*, 317 Ga. 22, 26 (1) (a) (891 SE2d 776) (2023) ("a properly disclosed and qualified expert can testify as both an expert and a fact witness"); *Austin v. Kaufman*, 203 Ga. App. 704, 709 (7) (417 SE2d 660) (1992) (rejecting defendants' argument that trial court erred in allowing expert testimony from medical examiner because he had not been identified by plaintiffs as an expert; because the medical examiner signed the decedent's death certificate, he was merely "an actor or observer of the subject matter of the suit" and not an expert witness).

of regularly conducted business activity,[10] she never made this argument below. Regardless, this oversight — in conjunction with defendants' failure to object — does not necessarily foreclose admission of the evidence at trial or prohibit Moton's experts from relying on it.[11]

3. In its order, the trial court found that defendants were entitled to summary judgment because Moton's experts "conceded that they were inferring negligence merely because of the injury" to Moton's hand, "a clear application of the doctrine of res ipsa loquitor that is inapplicable in medical malpractice cases[.]" "[R]es ipsa loquitur is a legal maxim that means the transaction or thing speaks for itself." (Citation and punctuation omitted.) *Matthews v. Yoplait USA*, 352 Ga. App. 591, 593 (835 SE2d 393) (2019). The trial court is correct that the doctrine is not applicable in medical malpractice cases in Georgia, see *Austin*, 203 Ga. App. at 705 (1), but as

---

[10] See, e.g., *Wilson v. Zapata Off-Shore Co.*, 939 F2d 260, 271-272 (I) (D) (5th Cir. 1991).

[11] The trial court excluded the discharge summary for purposes of summary judgment only and our ruling in Division 1 makes clear that it is not necessary to consider the discharge summary in order to find a genuine issue of material fact in this case sufficient to reverse the grant of summary judgment. Moreover, our ruling should in no way be construed as a comment on the ultimate admissibility of the discharge summary.

established by our rulings above, and as Moton argues on appeal, she does not need to rely on res ipsa loquitor to defeat summary judgment.

To prevail on her claim for medical malpractice, Moton "must establish by a preponderance of the evidence both that [defendants] breached the applicable standard of care and that this breach proximately caused [her] injuries." *Swint v. Alphonse*, 348 Ga. App. 199, 204-205 (1) (820 SE2d 312) (2018). In order to satisfy this burden, "a medical malpractice plaintiff must present expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." (Citation and punctuation omitted.) *Edokpolor*, 347 Ga. App. at 287 (1). As we have explained,

> the expert's role is to present a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injuries. However, Georgia law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty. Further, causation may be established by linking the testimony of several different experts and must be determined in light of the evidentiary record as a whole. It is well established that questions

> regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases.

(Citations, punctuation, and emphasis omitted.) *Sampson*, 369 Ga. App. at 631 (reversing grant of summary judgment to defendants where plaintiff's experts opined that the "only apparent cause" of an infant's injuries was co-sleeping with his mother). In *Sampson*, we concluded that "the trial court had applied an incorrect standard when it held that [plaintiff's] experts were required to 'give a definite conclusion as to what had occurred' based upon 'concrete evidence.'" Id. at 631. Instead,

> Georgia law requires only that an expert . . . express some basis for both the confidence for which his opinion is formed and the probability that his conclusion is accurate. The expert can meet this requirement by stating that the only apparent cause of the injury was the defendant's action. And although an expert may lack direct evidence of the cause of an injury, the expert may rely upon circumstantial evidence to support his theory. Even if an expert's opinion is based on circumstantial evidence, this does not mandate the exclusion of his opinion but, rather, presents a jury question as to the weight which should be assigned to it.

(Citations, punctuation, and emphasis omitted.) Id. at 631-632. See also *Austin*, 203 Ga. App. at 706 (1) (in a medical malpractice action, "[negligence, like any other fact, may be proved by circumstantial evidence as well as by direct testimony").

The opinions of both experts satisfied this burden. Dr. Smith, a nurse and Moton's standard of care expert, testified that the standard of care for a nurse requires Dilantin to be administered through a large vein and "at least a 20-gauge IV"; it cannot be administered "in one of [the] smaller branches of a vein, say one that's in the hand." As Dr. Smith explained, if Dilantin is administered through a small vessel in a hand, it is "very likely that there will be extravasation with tissue death in the area." Dr. Smith testified that by piecing together the timing and types of medications administered to Moton, she determined that defendants "had to have given [the Dilantin] in a hand or a wrist site." And that it was her opinion "to a reasonable degree of medical certainty or more likely than not" that defendants "used the hand veins."

Dr. Liu, Moton's causation expert, opined that it is "more likely than not, Dilantin was infiltrated through a peripheral IV that was inserted in the left hand of Ms. Moton, resulting in the injuries that she sustained." While Dr. Liu acknowledged

19

that the medical records were silent as to which site the medication was administered through, he testified that he reached his causation opinion by employing a differential diagnosis methodology based upon Moton's medical records and photographs of her hand. He considered a list of all possible causes of Moton's injury and then systematically ruled them out until he determined that extravasation of Dilantin "was [the] most likely cause."[12]

For the reasons set forth above, we reverse the order of the trial court granting summary judgment in favor of defendants. See *Sampson*, 369 Ga. App. at 633 ; *Swint*, 348 Ga. App. 199. See also *Kapsch v. Stowers*, 209 Ga. App. 767, 768-769 (1) (434 SE2d 539) (1993) (affirming denial of defendants' motions for directed verdict and j.n.o.v. where expert testimony showed that "based on the type of injury observed, it was most likely caused by the improper placement of a retractor during the operation").

*Judgment reversed. Barnes, P. J., and Watkins, J., concur.*

---

[12] Dr. Liu's list included extravasation injury from Dilantin, vasopressor-induced injury (which he categorically ruled out because Moton had not been given any vasopressors), thrombosis, infection/cellulitis, and a pressure-related injury.